UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MARC LEWIS,

                              Plaintiff,

      vs.

                                        9:08-CV-482

J. JOHNSON, et al.,                            (TJM/ATB)

                               Defendants.

_____

MARC LEWIS, Plaintiff Pro Se
CHRISTINA L. ROBERTS-RYBA, Asst. Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred by Senior U.S. District Judge Thomas J. McAvoy, for

Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules

N.D.N.Y. 72.3(c).  The case was transferred to me on January 4, 2010, following the

retirement of U.S. Magistrate Judge Gustave J. Di Bianco.  (Dkt. No. 125).

While an inmate in the custody of the Department of Correctional Services

("DOCS"), plaintiff filed his complaint, pursuant to 42 U.S.C. § 1983, regarding

incidents that occurred during his incarceration at Franklin Correctional Facility

("Franklin") and Upstate Correctional Facility ("Upstate").  Liberally construed,

plaintiff's amended complaint[1] (Dkt. No. 40) makes several claims against 14

_____

[1] Plaintiff was granted leave to file an amended complaint on January 26, 2009.  (Dkt. No.
39).

defendants[2] relating to events in 2006 and 2007.  He alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers at Franklin on or about June 15, 2006, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation.[3]  Plaintiff claims that defendants Secore and Favro violated his Eighth Amendment rights by assaulting him on June 19, 2006, and that defendant Norcross failed to intervene.  He also alleges that he was a victim of another unconstitutional assault on June 24, 2006, by defendant Reardon and other unnamed officers.  Plaintiff claims that, over the following days and weeks, nurses Davenport, Volpe, Walsh, and Chesbrough, and physician assistant ("PA") Tichenor all denied him constitutionally-adequate medical care, by failing to properly treat him for the various injuries he suffered as a result of the two "assaults."  He states that defendant Demars violated his due process rights, while presiding at the disciplinary hearing on the charges brought by defendant

---

[2] It is well-settled that the state itself cannot be sued under section 1983.  *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  An action against state officers in their official capacities is tantamount to an action against the state.  *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991).  To the extent that the defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment.  *Huang v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2d Cir. 1999).

[3] Plaintiff characterizes the subsequent actions of defendants Secore, Favro, Norcross, Reardon, Demars, McCasland, and Hoffnagle as retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

Johnson, which resulted in plaintiff's confinement in a Special Housing Unit ("SHU")
until the charges were reversed by DOCS in June 2007.  Finally, plaintiff suggests that
defendants McCasland and Hoffnagle violated plaintiff's First Amendment rights by
improperly handling his legal mail in January 2007.  Plaintiff seeks substantial
monetary damages from the defendants.

Presently pending is defendants' motion for summary judgment pursuant to Fed.
R. Civ. P. 56. (Dkt. No. 110).  Plaintiff has responded in opposition to the motion.
(Dkt. Nos. 123, 124).  Defendants filed a reply (Dkt. No. 128), and plaintiff submitted
a sur-reply (Dkt. Nos. 129, 130).  For the following reasons, this court recommends
that defendants' motion be granted in part and denied in part.  I particular, this court
recommends that summary judgment be denied with respect to the Eighth Amendment
excessive force or failure-to-intervene claims against defendants Secore, Favro,
Norcross, and Reardon.  Dismissal is recommended with respect to the plaintiff's
other causes of action.

## DISCUSSION

## I.    Facts

Plaintiff authored and signed a letter dated June 15, 2006, complaining to the
Superintendent of Franklin and other DOCS officials about the alleged assault of
another inmate by at least four correction officers that evening.  (Pl.'s Decl., Ex. A,
Dkt. No. 124-3).  Plaintiff spoke to the Superintendent in the mess hall about the letter

3

on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18-19, Dkt. No. 110-3). The letter was stamped as received in the administrative office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A.    The Misbehavior Report Filed by Defendant Johnson

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110-8).[4] He concluded that plaintiff's known handwriting was similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110-8 at 6). He directed that plaintiff

---

[4] Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110-8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom right-hand corner of the pages, not the page numbers in the CM-ECF header.

be confined in the SHU pending the disciplinary hearing (*Id.*, Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251-1.6 & 251-1.7, *Id.*, Ex. C, Dkt. No. 110-8 at 21-22).

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days.  Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1-67).  Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges.  (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified.  (Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 6, 13).[5]  On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate.  (*Id.* , Dkt. No. 124-4 at 14).

### B.      The First "Assault" on June 19, 2005

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was

---

[5] During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU.  Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed.  (*Id.*, Dkt. No. 124-4 at 4-6, 11-14).

involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters.  (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3-4, Dkt. No. 40 at 9-10;[6] Gardner Decl. ¶¶ 2-7, Dkt. No. 110-10).  Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up."[7]  (AC ¶ 4).

Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6-8).  Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor.  (AC ¶¶ 9-10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene.  (AC ¶ 11).  While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him.  The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted."  (Secore Decl., Dkt. No. 110-11; Favro Decl., Dkt. No. 110-12; Norcross

---

[6] Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of Facts," unless the reference is to another section of the pleading.

[7] Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate.  (Gardner Decl. ¶¶ 5-6).

Decl., Dkt. No. 110-18).[8]

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw.  He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries.  (AC ¶¶ 13-17).  Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured.  (Davenport Decl., Dkt. No. 110-19; Volpe Decl., Dkt. No. 110-14).  The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (*Id.*; Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records[9] at 34-36).  Plaintiff claims that these records were fabricated and false.  (AC ¶ 15; Pl.'s Decl., Dkt. No. 124-2 at 4-6).

## C.    The Second "Assault" on June 24, 2005

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers.  Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90º degree angle while having him in a body lock . . ."  (AC ¶ 20).  Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit.  (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin

---

[8] The correction officer's account of the incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions.  (*Id.*).

[9] The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates.  (Reardon Decl. ¶¶ 3-4, 10-12, Dkt. No. 110-13).  Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier.  (*Id*. ¶¶ 5-8,14).  Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th.  (Pl.'s Decl., Ex. C, Dkt. No. 124-5 at 39-41).  As a result of the grievance, plaintiff was eventually transferred to the SHU at Upstate.  (*Id*.).

### D.    Further Issues Regarding Medical Treatment

Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call.  He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin.  (AC ¶¶ 23-24).  After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems.  (Walsh Decl. ¶¶ 6-7, Dkt. No. 110-15; Chesbrough Decl. ¶¶ 6-9, Dkt. No. 110-16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas.  (AC ¶ 25).  Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined

8

and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter.  (Tichenor Decl., ¶¶ 6-11, Dkt. No. 110-17).

### E.    Issues Regarding Legal Mail

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures.  Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender.  (Dep. 66-71, AC ¶¶ 31-33).  Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6-9, Dkt. No. 110-20).  Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4-10, Dkt. No. 110-21).  Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels.  (McCasland Decl., Ex. B, Dkt. No. 110-20 at 44).

## II.    <u>Summary Judgment–Legal Standards</u>

Summary judgment is appropriate where there exists no genuine issue of

material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.  "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers."  *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia, Burgos v. Hopkins*, 14 F.3d

787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")).

"However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).   While a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

## III.   Excessive Force/Failure to Intervene

### A.   Legal Standards

#### 1.   Eighth Amendment–Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).   The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).   To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.   *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for

11

excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*,

12

344 F.3d 282, 291 (2d Cir. 2003).

### 2. Failure to Intervene

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy*, No. 9:07-CV-654 (DNH/GHL), 2010 WL 2044705, at*8 (N.D.N.Y. May 24, 2010).[10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).

---

[10] *See also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene)*; Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994).

[11] *See also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B.     Application**

Plaintiff has adequately alleged that the named correction officers either

participated in, or were present for and failed to intervene in, the application of

excessive force.  While plaintiff's excessive force claims have weak evidentiary

support, he has established that there are genuine issues of material fact that should be

resolved by a jury.

### 1.     The "Assault" on June 19, 2010

Defendants Secore and Favro admittedly used force to subdue plaintiff on June

19, 2010.  In his amended complaint (Dkt. No. 40), deposition (Dep. at 31-38, and

pleadings in opposition to the summary judgment motion, plaintiff consistently alleged

details of an assault which, if believed, would amount to a "malicious use of force to

cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the

seriousness of his injuries.  *Blyden*, 186 F.3d at 263.  Plaintiff claims he was struck in

the head or face by each defendant, dragged to another room, tripped, and repeatedly

punched and kicked while he was lying handcuffed on the floor.  Although plaintiff

admits that he kicked at the correction officers to try to defend himself from their

blows once he was on the floor (Dep. at 33-34), this did not justify the alleged prior

application of excessive force.  As described by plaintiff, the incident involved more

than an *de minimis* use of force and a malicious and wanton attempt to cause harm.

*Sims*, 230 F.3d at 22; *Hudson*, 503 U.S. at 7.

The correction officers and Sgt. Norcross all vehemently deny that more than

14

the minimum amount of force required to restrain the plaintiff was used, and the medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.[12]   However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006.  *See, e.g., Griffin v. Crippen*, 193 F.3d 89, 90-92 (2d Cir. 1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz*, 103 Fed. Appx. 434, 437 (2d Cir. 2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,[13] were sufficient to withstand a summary judgement motion); *Dallio v.*

---

[12] As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force.  While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment.  *See, e.g., Reyes v. McGinnis*, 00-CV-6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial).

[13] The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate."  *Id.*

15

*Sanatamore*, 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora*, 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36-38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4-9, Dkt. No. 110-18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant

Norcross's culpability that should be addressed at trial.

To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims.[14]  Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene.  There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it was over.  In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present.[15]

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers.  *Cf. Bouknight v. Shaw*, 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability,

---

[14] *See, e.g., Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

[15] *See e.g., Rendely v. Town of Huntington*, No. 2:03-CV-3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 220 (D. Conn. 2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to

allege more than the fact that the officer spread rumors that plaintiff was a "snitch"

and a homosexual; plaintiff needed to allege facts establishing that the officer intended

to incite an assault or knowingly disregarded that he had created an environment that

generated a significant risk of harm).[16]   A comment that plaintiff needed to be taught

the rules of the prison, as he was being transported to the SHU because of a

disciplinary charge, is subject to a completely benign interpretation.  Plaintiff's bare

allegation that defendant Gardner made that statement does not establish a viable

cause of action that Gardner induced the other defendants to commit assault.

### 2.    The "Assault" on June 24, 2006

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon

pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a

wall.  Plaintiff asserts that defendant Reardon was talking "tough stuff" during the

incident and was either trying to break plaintiff's arm or cause him pain.  (Dep. at 64).

Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused

lasting limitations in function.  (Pl.'s Memo. of Law at 24-25, Dkt. No. 124-1; Dep. at

80).  Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain

and then tendinitis of the left pectoralis major tendon.  (Tichenor Decl. ¶ 10; Medical

Records at 27, 31).  When plaintiff was examined by a prison doctor in April 2008, he

---

[16] It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself,  rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).

detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant."  (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10-14).  Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance  on June 25th describing the assault.  His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim.  The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances–a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.[17]  While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a

---

[17] Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search.  (Def. Memo. of Law at 19-20, Dkt. No. 110-6). This court interprets plaintiff's testimony (Dep. at 62-63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted.  Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of  force. (Reardon Decl. ¶¶ 10-14 & Ex. D, Dkt. No. 110-13 at 32).

significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.[18]

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.[19]   While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion.  *See, e.g.*, *Mitchell v. Keane*, 974 F. Supp. 332, 340-41 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal);  *Rivera v. Goord,* 119 F. Supp. 2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis*, 00-CV-6352, 2003 WL 23101781, at *1, 6 (W.D.N.Y. Apr. 10, 2003)

---

[18] Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door.  (Medical Records at 24).  So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

[19] During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU–*e.g.*, by refusing meals brought by the officers and acting like a "knucklehead."  (Dep. at 63, 65).

(denying summary judgment motion on excessive force claim against correction officer who, *inter alia*, allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). *Cf. Robison v. Via*, 821 F.2d 913, 924-25 (2d Cir. 1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

## IV.   **Due Process**

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

### A.   **Applicable Law**

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998).  Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir. 2003).  Defendants apparently concede that the disposition of the most serious disciplinary charge against

plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards.[20]

In *Wolff v. McDonnell*, 418 U.S. 539, 563-64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id*. at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)(some evidence standard); *McCann* v. Coughlin, 698 F.2d 112, 121-22 (2d Cir. 1983) (fair and impartial hearing officer). Violations of state regulations with respect

---

[20] In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards*, 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short–e.g., 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65-66 (collecting cases).

to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998)(violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995)(state law violation does not necessarily rise to the level of a constitutional violation).[21]

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id*. (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id*.

### B.   Application

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process

---

[21] "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky*, 01CIV.8235, 2002 WL 31040370, at *13 n.21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward*, 458 F. Supp. 624, 627 (S.D.N.Y.1978).

in conducting the hearing.[22]  Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty.  (AC ¶ 19).  Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS.  (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 13).  Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance.  (Pl.'s Memo. of Law at 30).[23]

### 1.    "Some" Evidence

In finding plaintiff guilty of two charges relating to the anonymous, threatening

---

[22] Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33).  This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration.  *See, e.g.*, *Brown v. Secore*, 9:08-CV-085, 2010 WL 980233, at *5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin*, have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

[23] Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare.  (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110-8 at 28).  However, after defendant Demars ascertained what assistance plaintiff needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested.  (Disc. Hearing Transcript at 6-9).  Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6-7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[24]  The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin.  (Johnson Decl., Ex. B, Dkt. No. 110-8 at 8-14).  Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received.  (Johnson Decl., Ex. B, Dkt. No. 110-8 at 6).  During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits.  (Disc. Hearing Transcript at 21-22).

While meager, the proof relied upon by defendant Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings.  *See, e.g.*, *Monier v. Holt*, 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D. Pa. Dec. 21, 2005),  *aff'd*, 259 Fed. Appx. 518 (3d Cir. 2007) (testimony of

---

[24] Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions.  (*Id.*)  Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters.  (Disc. Hearing Transcript at 32-33).

officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson*, 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd*, 242 Fed. Appx. 19 (4th Cir. 2007), *cert. denied*, __ U.S. __, 128 S. Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 341 n. 3 (W.D.N.Y. 2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson*, 2:06CV019, 2006 WL 618124, at *2 (E.D. Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).  While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff.  *See, e.g.*, *Monier v. Holt*, 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson*, 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson*, 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by

investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[25]

### 2.    Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing.  *Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (citing *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988).  On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing.  (Disc. Hearing Transcript at 1).[26]  Dep. Sup. Demars offered assistance to plaintiff in

---

[25] In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing.  *See, e.g., Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico*, 356 F.3d 481, 489-90 (2d Cir. 2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility).  However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill*, a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence.  *See Luna v. Pico*, 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence).  This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination.  If  Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

[26] Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures.  (Secore Decl., Ex. C, Dkt. No. 110-11 at

securing witnesses and documents for the hearing, and plaintiff accepted.  Plaintiff

explained what help he needed and, before the hearing was adjourned for several days,

stated that he was satisfied with the assistance that the hearing officer provided.  (Disc.

Hearing Transcript at 1-7).

Ultimately, defendant Demars arranged for the testimony of all of the witnesses

that plaintiff deemed critical, including the Superintendent of Franklin, although Dep.

Sup. Demars was dubious about why plaintiff needed the Superintendent.  (Disc.

Hearing Transcript at 10-19, 25-29, 39, 41-42, 44-45, 53, 61).  The hearing officer

procured copies of most of the documents that plaintiff requested, although the facility

was unable to locate one "pass" which plaintiff requested.  Defendant Demars turned

down plaintiff's request for DNA testing of the anonymous, threatening letters that

prompted the charges.  (Disc. Hearing Transcript at 9-10, 29).  While plaintiff raised

numerous "objections" at the end of the hearing, he did not object to any deficiencies

in the assistance he received from defendant Demars.  (Disc. Hearing Transcript at 64-

65).[27]

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the

---

28).  Plaintiff formally waived his right to any assistance in connection with another hearing that
month.  (Reardon Decl., Ex. B, Dkt. No. 110-13 at 10).

[27] Plaintiff did object that defendant Demars was biased because he was a "Dep.,"
(presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the
end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a
hearing officer.  (Disc. Hearing Transcript at 65).  *See Chavis v. Flagler*, 01-CV-0510, 2005 WL
563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing
officer are not held to the same standards regarding neutrality and conflicts of interests as judges
or adjudicators in other contexts, although they may not prejudge the evidence).

proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se*. *Lee v. Coughlin*, 902 F. Supp. 424, 433-34 (S.D.N.Y. 1995).  However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson*, 30 F. Supp. 2d 613, 619 (S.D.N.Y. 1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia*, *Murray v. Dixon*, 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects.  *Id.*  In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated.  *Ayers v. Ryan*, 152 F.3d at 81.  While the Second Circuit characterized it

29

as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier*, 9:08-CV-909, 2010 WL 1489897, at \*6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson*, 30 F. Supp. 2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier*, 2010 WL 1489897, at \*6 (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense)[28]; *Brown v. Dotson*, 2007 WL 1033359, at \*3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan*, defendant Demars did not violate plaintiff's due process rights in connection

---

[28] *See also Clark v. Dannheim*, 590 F. Supp. 2d 426, 429-31 (W.D.N.Y. 2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

with his rendering of assistance in connection with the hearing.  In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

## V.    Alleged Mail Tampering

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim."  *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citing *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d. Cir. 1997).  In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown.  *See Lewis v. Casey*, 518 U.S. 343, 351-52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled . . . ."  *Washington v. James*, 782 F.2d 1134, 1139 (2d. Cir. 1986) (citation omitted).  *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the

conditions of confinement.  518 U.S. at 355.  "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.'"  *Davis v. Goord*, 320 F.3d at 352 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate,[29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle.  (AC ¶¶ 29-33).  During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident.  (Dep. at 67, 74).  Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss[30] of the two items interfered with any pending legal matter.  (Dep. at 71-75).  Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff

---

[29] The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations.  *See, e.g., Gilliam v. Quinlan*, 608 F. Supp. 823, 838 (S.D.N.Y. 1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

[30] Plaintiff refused to accept the "opened" mail twice and then tried to recover it.  By that time, the two items could not be located by DOCS, the post office, or the senders of the mail.  Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures.  After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate.  (Pl.'s Decl. ¶¶ 26-32, Ex. D, Dkt. No. 124-5 at 43-61).

was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye*, 516 F.2d 1367, 1370-71 (2d Cir. 1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or any other legal matter, was insufficient to survive summary judgment).

## VI.   <u>Retaliation Claims</u>

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle.  For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

### A.   **Applicable Law**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)

(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  Third, the plaintiff must establish a causal connection between the protected speech and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 2003 U.S. App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  Accordingly, plaintiff must set forth non-conclusory allegations.  *Bennett*, 343 F.3d at 137 (citing *Dawes*, 239 F.3d at 491).  Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.  *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected

34

liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).  However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process.  *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988).  Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim.  *Id.*

### B.     Application

#### 1.     First Amendment Protection

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers.  It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim.  *See, e.g.*, *Smith v. Greene*, 9:06-CV-0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey*, 95-CV-1135, 1991 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v.*

*McGinnis*, 533 F. Supp. 2d 337, 339 (W.D.N.Y. 2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips*, 66 F.3d 470, 478-79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

### 2.   Connection Between "Speech" and Alleged Adverse Actions

Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52-53). To the extent these defendants were motivated to take some

36

adverse action[31] against plaintiff, which they deny, the fact that plaintiff was just

charged with creating some of the anonymous letters threatening the Franklin staff,

would be a much more likely trigger.

Plaintiff provides no support for the suggestion that defendant Reardon was

aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive

force on June 24th. In fact, plaintiff provides a more plausible explanation for why

defendant Reardon and the other SHU officers might be inclined to "assault" him on

June 24th–plaintiff was refusing meals and generally acting like a "knucklehead"

toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants

McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with

plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15,

2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June

19th, defendant Johnson may not have seen plaintiff's letter, which was not received by

the administrative office until the following day. However, Lt. Johnson's inmate

misbehavior report confirms that he was advised about plaintiff's prior contact with

_____

[31] Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g, Davis v. Goord*, 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia*, *Dawes v. Walker*, 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter.  Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials.  There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant.  (Dep. at 19; Johnson Decl. ¶ 4).  It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter.  However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats).  Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took.  *See, e.g.*, *Ayers v. Stewart*, 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir. 1996) (given the weakness of his

retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation–namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him–does not suffice to defeat summary judgment); *Crenshaw v. Herbert*, 445 F. Supp. 2d 301, 305 (W.D.N.Y. 2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

## VII.   Deliberate Indifference to Medical Needs

### A.   Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184.

39

### 1.      Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.*  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as

40

the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.*  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it

41

is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### B.   Application

#### 1.   "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006,

he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit.  (AC ¶¶ 14, 23).  At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw.  (Dep. at 80-81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff.  (Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records at 25-36).  In September and October 2006, PA Tichenor evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8-10; Medical Records at 27, 31).  When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm,[32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80).  Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door.  (Medical Records at 24).  Hence, it is unclear whether the doctor's observations

---

[32] Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10-11; Dep. at 80-81).  So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03. Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g.*, *Ninortey v. Shova*, 05 Civ. 542, 2008 WL 4067107, at *5, 16 (S.D.N.Y. Sept. 2, 2008) (inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly*, 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado*, 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to

44

his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy*, 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain.  (AC ¶¶ 14,17).  Plaintiff denied any injuries on June 19th.  (Davenport Decl., Exs. A & B).  The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained.[33]  Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact.  *See, e.g.*, *Brown v. White*, 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco*,

---

[33] The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records.  (Defs.' Memo. of Law at 4-10, Dkt. No. 110-6).

92 Civ. 7670, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[34]

However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl.'s Memo. of Law at 3-13).  It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[35]  Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged

---

[34] *See also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . .  and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

[35] Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006.  "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse.  I asked him why he would waiting until now to report it.  He stated, 'None of your business, just document it.'  I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06."  (Chesbrough Decl. ¶ 9; Medical Records at 32).

injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder.  *See, e.g.*, *Benitez v. Mailloux*, No. 9:05-CV-1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate indifference claim), *report-recommendation rejected, in part, on other grounds*, 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord*, 115 F. Supp. 2d 432, 435 (S.D.N.Y. 2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records).[36]

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards.  Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006.  (Dep. at 48-57).  He does not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006.  (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9-10).

---

[36] *But see Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care.  Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512-13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even crediting only the medical evidence that plaintiff does not claim is fabricated,[37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment.  *See, e.g., Evans v. Manos*, 336 F. Supp. 2d 255, 261-62 (W.D.N.Y. 2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care).  *See also Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if completely ignored in June and July 2006, would have created a serious risk to his health.  Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on

---

[37] Plaintiff credits, for example, the findings of the prison doctor in April 2008.  (Dep. at 44-45, 80-81; Pl.'s Sur-Reply, Dkt. No. 129 at 7).  As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength.  (Medical Records at 11).  The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009.  (Medical Records at 11; Dep. at 80-81).  PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues.  With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal.  (Tichenor Decl. ¶¶ 8-11, Medical Records at 31).  When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact."  (Medical Records at 27).

plaintiff.  Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

### 2.    "Deliberate Indifference"

The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs.  Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it.  Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary.  However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate–July 12, 2006. (AC ¶ 23).  The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7-9; Medical Records at 32-34).[38]  Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse.  Such a claim cannot support a viable

---

[38] The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009.  (Dep. at 51-53).

cause of action for deliberate indifference.[39]

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries.  (AC ¶ 25; Dep. at 44-45, 56-57, 80-81).[40]  Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

## VIII.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe

---

[39] Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more occasions (Dep. at 41-42, 47, 49-50, 51-53) would not support a claim of deliberate indifference.  *See, e.g., Savage v. Brue*, 9:05-CV-857, 2007 WL 3047110  at *9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos*, 336 F. Supp. 2d at 261-62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

[40] Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007.  (Pl.'s Memo. of Law at 10-11).

50

that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez*, 238 F.3d at 194 and *Luna v. Pico*, 356 F.3d at 489-90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006

51

that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights.[41]  Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate.  *Ayers v. Ryan*, 152 F.3d at 81.  Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim.  As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate.  *See, e.g.*, *Pettus v. McGinnis*, 533 F. Supp. 2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips*, 66 F.3d at 479.

---

[41] *Cf. Luna v. Pico*, 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene.  *See, e.g., Hudson*, 503 U.S. at 9-10.  Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation.  *See, e.g.*, *Dallio v. Sanatamore*, 2010 WL 125774, at *14.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' summary judgment motion be **DENIED IN PART**, as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth Amendment claims based on excessive force against defendant Reardon.  And, it is further

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


**Dated: August 5, 2010**

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**